**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAYMOND REDLICH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-CV-00019-NAB |
| | ) | |
| | ) | |
| CITY OF ST. LOUIS, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on the Motion for Summary Judgment filed by Defendant City of St. Louis ("City" or "Defendant") (Doc. 32), and the partial Motion for Summary Judgment filed by Plaintiffs Raymond Redlich and Christopher Ohnimus ("Redlich" or "Ohnimus," respectively, or collectively, "Plaintiffs") (Doc. 36). The motions have been fully briefed and are ripe for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Court will grant in part and deny in part the City's Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

## I.    PROCEDURAL BACKGROUND

On January 8, 2019, Plaintiffs filed their five-count Complaint for Declaratory and Injunctive Relief against the City of St. Louis. (Doc. 1.) Plaintiffs, who are Christians, brought this action based on municipal citations that were issued on October 31, 2018 for distributing bologna sandwiches to the homeless without a temporary food permit in violation of City Ordinance No. 68597.

Plaintiffs bring each of their first three claims under the First and Fourteenth Amendments to the United States Constitution: Count I—Free Exercise of Religion; Count II—Freedom of Expression; Count III—Equal Protection of the Laws and Freedom of Association.  Plaintiffs bring their fourth and fifth claims pursuant to Missouri law: Count IV—Rights of Conscience under the Missouri Constitution Article I, Section 5; and Count V—Missouri Religious Freedom Restoration Act (Mo. Rev. Stat. § 1.302). (Doc. 1.) Plaintiffs' Complaint asks the Court to issue a declaration that St. Louis City Code § 11.42.230, Chapter 9[1]  violates the following laws as applied to Plaintiffs and others similarly situated: (a) the First and Fourteenth Amendments of the U.S. Constitution; (b) Article I, Section 5 of the Missouri Constitution; and (c) Mo. Rev. Stat. § 1.302. Plaintiffs also seek an injunction prohibiting the City from enforcing St. Louis City Code § 11.42.230, Chapter 9, against Plaintiffs and others similarly situated. In addition, Plaintiffs seek attorney fees and costs.

The City moves for summary judgment on all five claims. Plaintiffs move for summary judgment on Counts I, II, and V only.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). To establish the existence of a genuine issue of material fact, "[a] plaintiff may not merely point to unsupported self-serving allegations." *Bass v. SBC Commc'ns, Inc.,* 418 F.3d 870, 872 (8th Cir. 2005). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to

---

[1] Plaintiffs' motion for summary judgment refers to "the Food Code," or Ordinance 68597. (Doc. 38.) Plaintiffs' Complaint refers to St. Louis City Code § 11.42.230, Chapter 9, "the Temporary Food Service Ordinance," which codified Ordinance 68597. (Doc. 1.)

withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "[T]here must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (emphasis added); *Davidson & Assoc. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005); *Smith v. International Paper Co.* 523 F.3d 845, 848 (8th Cir. 2008) (the nonmoving party must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy"). Evidence that is "merely colorable" or "is not significantly probative" is insufficient. *Anderson*, 477 U.S. at 249-50; *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011). Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## III.    FACTUAL BACKGROUND

The City and Plaintiffs filed separate Statements of Uncontroverted Material Facts in support of their respective motions. (Docs. 35, 37.) Each side has made preliminary objections to specific evidence relied upon by their opponent. The Court will address the parties' objections and determine which of the parties' exhibits may be considered in evaluating the cross motions for summary judgment.

### A.  Plaintiffs' Objections to the City's Exhibits

Plaintiffs request that the Court exclude eleven of the City's exhibits in support of its motion. (Doc. 44.)

#### 1.  2009 Food Code

Plaintiffs contend Exhibits F, H, J, K, L, and M should be excluded because they are not authenticated and/or because they are incomplete versions of the documents they purport to be.

The City responds that these exhibits are excerpts from chapters of the 2009 Food Code published by the U.S. Department of Health and Human Services and the Food and Drug Administration, abbreviated in the interest of judicial economy and convenience. Although Plaintiffs object to the City's Food Code exhibits, Plaintiffs' own exhibits include a more comprehensive version of the same 2009 Food Code. (Doc. 36-10, Plaintiffs' Exhibit 7.) Additionally, as Plaintiffs point out in defense of their own exhibits, the applicable standard for evidence offered in support of a motion for summary judgment is whether the proffered evidence *could* be presented at trial in an admissible form. *Gannon International, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) ("[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form."). Therefore, the Court overrules Plaintiffs' objection and will consider the Food Code.

### 2. Ordinances

Plaintiffs argue the St. Louis City Ordinances at the City's Exhibits E and G should be excluded because they are not authenticated.[2] Although it was not necessary at the summary judgment stage, *see Gannon International, Ltd.,* 684 F.3d at 785, the City has cured any alleged deficiency by supplementing the record with certified copies of both Ordinance 68597 and Ordinance 71106. (Docs. 52-1, 52-2.) Accordingly, the Court overrules Plaintiffs' objection and will consider the Ordinances. *See* Fed. R. Evid. 902(4) (certified copies of public records are self-authenticating).

### 3. Affidavits

---

[2] The Court notes that Plaintiffs do not explicitly dispute the authenticity of the exhibits, Plaintiffs merely argue the City did not authenticate them. However, Plaintiffs rely on Ordinance 68597 in support of its own motion. (*Compare* Doc. 35-5 *with* Doc. 36-9.)

The City's Exhibits A, I, and O are affidavits of Kenneth Kegel, Stephen Ogunjobi and Matthew Haslam.  Plaintiffs seek to exclude these affidavits, arguing that the City did not meet its Rule 26 obligations in disclosing these witnesses. Federal Rule of Civil Procedure 37(c)(1) states, "[I]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In the Eighth Circuit, "[t]he use of an undisclosed witness should seldom be barred unless bad faith is involved." *Bergfeld v. Unimin Corp.*, 319 F.3d 350, 355 (8th Cir. 2003) (citing *Mawby v. United States,* 999 F.2d 1252, 1254 (8th Cir. 1993) and *Mills v. Des Arc Convalescent Home,* 872 F.2d 823, 826 (8th Cir. 1989)). The Court will address each disputed affidavit individually.

### a. Exhibit A: Kegel Affidavit

Kenneth Kegel is a Health Services Manager II at the St. Louis City Health Department and manages inspectors who enforce the temporary food permit ordinance at issue. Plaintiffs argue that Kegel was never disclosed as a witness, thus his testimony should be excluded pursuant to Rule 37(c)(1).

The City responds that Kegel and his testimony were made known to Plaintiffs by the City's email production. In June and August of 2020, the City responded to requests for production by providing emails that contained the identity of Kegel and the information in his affidavit.

Rule 26(e) provides that "A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, **and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing**…" FRCP 26(e)(1)(A) (emphasis added). Attached to Kegel's

affidavit is an email that Kegel sent in 2012 regarding complaints from residents that groups are coming downtown and providing food to the homeless, and "[a]lthough many groups have good intentions when providing food to the homeless, there have been occasions where individuals have gotten sick as a result of the provided food." (Doc. 35-1.) Plaintiffs do not assert they have never seen this email or that they have never heard of Kegel, only that the City did not disclose him as a witness. Because Kegel's identity and testimony were revealed to Plaintiffs in the City's documents produced in response to discovery requests, Plaintiffs had notice that Kegel may have had information relevant to the case. The Court does not believe the City failed to meet its Rule 26 obligations with respect to disclosing Kegel, and even assuming it did, any failure was harmless and did not result in unfair prejudice. *See Bergfeld,* 319 F.3d at 355 (affirming district court's consideration of affidavit because "[a]lthough [affiant's] name was not included in Lockheed Martin's disclosures, Bergfeld had adequate notice during discovery that [affiant] was a person likely to have discoverable information."). The Court will not exclude Kegel's affidavit under Rule 37(c) and overrules Plaintiffs' objection.

### b. Exhibit O: Ogunjobi Affidavit

Stephen Ogunjobi is a St. Louis Metropolitan Police Department employee. Plaintiffs argue that although Ogunjobi was disclosed as a witness, he was only disclosed to testify "regarding the circumstances of Plaintiff Redlich's citation on October 31, 2018." (Doc. 44-7, The City's Supplemental Voluntary Initial Disclosures.) Ogunjobi's affidavit contains attestations regarding assisting multiple homeless persons whom Ogunjobi suspects suffered from food-related illness. Because this particular testimony was not disclosed prior to summary judgment, Plaintiffs seek to exclude the Ogunjobi Affidavit from consideration pursuant to Rule 37(c)(1).

The City responds that it identified Ogunjobi as a potential witness, and Plaintiffs made no attempt to depose him. The City contends that his deposition would have revealed that Ogunjobi's personal observation of seeing multiple homeless persons become ill from suspected unsafe food was a factor in what led him to engage with Plaintiffs about their October 31, 2018 food distribution. The City also points out that although Plaintiffs seek to limit the scope of Ogunjobi's testimony to a strict interpretation of the City's initial disclosures, Plaintiffs have provided affidavits wherein their testimony is not limited to their initial disclosures. The City asks that if the Court strictly limits Ogunjobi's testimony to the initial disclosures, that Plaintiffs' testimony be equally so limited.

Ogunjobi was identified by Plaintiffs in their January 2019 complaint as the officer who issued the October 31, 2018 citation, and was then disclosed as a potential witness by the City in May 2019. Plaintiffs have known that Ogunjobi was a witness since the inception of this case, and could have deposed him before filing summary judgment motions, or sought leave to depose him once they reviewed his affidavit. In any event, the Court is not relying on the testimony in question or the City's statement of fact that it purports to support. Thus, Plaintiffs' objection and request for exclusion is moot.

### c. Exhibit I: Haslam Affidavit

Matthew Haslam is an epidemiologist at the St. Louis City Health Department. Plaintiffs argue that Haslam's affidavit should be excluded because the City responded to interrogatories that it did not anticipate calling expert witnesses, and the Haslam affidavit is an attempt to submit expert testimony.

The City responds that Haslam is a lay witness under Federal Rule of Evidence 701, not an expert. The City points out that the Eighth Circuit concluded that "personal knowledge or

perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony." *Burlington N. R. Co. v. State of Neb.*, 802 F.2d 994, 1004–05 (8th Cir. 1986).

As he states in his affidavit, Haslam is employed by the City as an epidemiologist and as part of his job duties, he researches national health standards and trends. He researched charitable food donations and their connection, if any, to foodborne illness amongst the homeless. His affidavit outlines the results of his research. They include information the City used to support four facts:

> 47. From 2012-2018 there were foodborne illness outbreaks amongst the homeless in Colorado, Utah, Ohio, California, and North Carolina, the origin of which was donated food. (Ex. I, Haslam Aff. ¶ 7).
>
> 48. Of the jurisdictions that suffered from foodborne illness outbreaks, a majority of them did not require temporary food permits for charitable events. (Ex. I, Haslam Aff. ¶ 8).
>
> 49. According to the CDC, in 2018 alone 5,893 people were hospitalized from foodborne illness, and 120 people died from foodborne illness. (Ex. I, Haslam Aff. ¶ 6.a & b).
>
> 50. The CDC estimates that one in six people get sick from contaminated food each year. (Ex. I, Haslam Aff. ¶ 6.c).

(Doc. 35, The City's Statement of Uncontroverted Material Facts ¶¶ 47-50.) In response to the City's Statement of Uncontroverted Material Facts, Plaintiffs also object to the above four facts based on Federal Rule of Evidence 602, which "excludes testimony concerning matters the witness did not observe or had no opportunity to observe." *Kemp v. Balboa,* 23 F.3d 211, 213 (8th Cir. 1994) (reversing jury verdict where lay witness testified to factual evidence based not upon her personal knowledge of the facts, but solely upon what she had read in medical records prepared by others).

While Rule 602 does prohibit a lay witness from testifying about matters that are not within the personal knowledge of the witness, Federal Rule of Evidence 701 permits lay witness testimony in the form of opinions or inferences if it is rationally based on perception and is helpful to a determination of a fact in issue. *See Greenwood Ranches, Inc. v. Skie Construction Co.,* 629 F.2d 518, 522 (8th Cir.1980); *see also* Fed. R. Evid. 701.The Court does not disagree with some of the foundational objections set forth in Plaintiffs' specific objections to the City's Facts at ¶¶ 47 and 48. Haslam's assertions, although made under penalty of perjury, do not provide particular sources for the specific foodborne illness outbreaks he identifies, instead stating he discovered them "as part of [his] research." He also provides no basis for his attestation that "A majority of US outbreaks listed above happened in jurisdictions that did not require temporary food permits for charitable events," such that it is unclear whether this purported fact is a statistic, his own conclusion, or something else. Even assuming the information is derived from his research, Haslam fails to provide additional information as to how or when the information was derived, nor does he identify the source(s) upon which he derived the fact or conclusion.[3] The Court will sustain the foundation objections to the City's Facts at ¶¶ 47 and 48. However, at this summary judgment stage, the Court overrules the objection to the affidavit as a whole based on Plaintiffs' contention that Haslam is an improper expert witness.[4] Of course, while the Court will consider the Haslam Affidavit as a whole, it need not accept every allegation as true and will consider competing evidence while giving the affidavit only the consideration it deserves under Fed. R. Civ. P. 56.

---

[3] In contrast, the City's Facts at ¶¶ 49-50 are based on information Haslam obtained from the Foodborne Disease Active Surveillance Network, a surveillance system created by the CDC to determine the burden of foodborne illness in the US and monitor trends in specific foodborne illnesses over time. (*See* Doc. 35-9, Haslam Aff. ¶¶ 5-6.)

[4] The Court notes that despite Plaintiffs' arguments that Haslam's affidavit is inadmissible expert testimony and has foundational issues, Plaintiffs similarly submit an affidavit wherein a lay witness (Redlich) attests that he has reviewed a CDC publication and then attests to CDC statistics regarding foodborne illness outbreaks. (Doc. 44-1, Second Affidavit of Raymond Redlich, ¶¶ 32-38.)

**B.  The City's Objections to Plaintiffs' Exhibits**

Although each Plaintiff was deposed and their deposition transcripts are in the record, Plaintiffs have also submitted affidavits in support of their motion for summary judgment and in response to the City's motion. (Doc. 36-1, Redlich Affidavit; Docs. 36-2, Ohnimus Affidavit; Doc. 44-1, Second Redlich Affidavit.) The City objects to statements in Plaintiffs' affidavits, arguing that they directly contradict Plaintiffs' prior deposition testimony. (Doc. 52 at 8-9.) The issues raised by any contradiction created by the subsequent affidavits go to the affiants' credibility, but they do not warrant exclusion of the affidavits themselves. The Court overrules the objection to Plaintiffs' affidavits. The Court will also consider competing evidence while giving each affidavit only the consideration it deserves under Fed. R. Civ. P. 56.

**C.  Facts**

Unless otherwise indicated, the following facts are undisputed.[5] Plaintiffs Ray Redlich and Chris Ohnimus both live and work in St. Louis City. They work at New Life Evangelical Center ("NLEC"), where Redlich is the Vice President, and Ohnimus is the assistant to Redlich. As part of Plaintiffs' job duties with NLEC, they conduct homeless outreach in the City, and they have worked with the homeless population in the City for several years.  Redlich and Ohnimus are Christians "who believe it is their religious obligation as followers of Jesus Christ to feed the hungry, to give drink to the thirsty, and to provide love, compassion, and company to the suffering."

---

[5] The undisputed facts set forth by the Court are from the allegations in Plaintiffs' Complaint to the extent they are admitted by the City in its Answer; from statements in the parties' statements of undisputed material facts supporting their summary judgment motions to the extent they are admitted by the opposing party or parties; and from the uncontradicted record.

Redlich and Ohnimus's homeless outreach includes sharing food with the homeless several days a week. During depositions, they explained their "street ministry" typically involves traveling around certain places they know they will find homeless people and making available to them what they need, which could be food, drink, hats, gloves, and blankets. Redlich sometimes provides faith-related written materials to homeless persons with whom he shared food. They usually bring coolers of bottled water and sandwiches and flyers. They distribute different types of sandwiches, most commonly peanut butter and jelly sandwiches. They also distribute ham sandwiches or bologna sandwiches. They sometimes distribute pre-packaged food, such as granola bars. They also regularly receive produce donations from Whole Foods, and will sometimes have fruit in the coolers, depending on availability and shelf life. Redlich admits that he can communicate his message that God loves the homeless by distributing food other than bologna sandwiches, and there's nothing about a bologna sandwich in and of itself that can communicate God's love as opposed to a different kind of sandwich. Ohnimus testified that their food distribution communicates a message "[n]ot specifically, but unintentionally" that they care about the homeless. He admits they can communicate that through other types of foods and distribution of nonfood items. Ohnimus believes he and Redlich are fulfilling a biblical mandate to help the needy. However, Ohnimus admits that when they give food to people not familiar with them, the recipients do not know Plaintiffs are giving them food because of their religious beliefs; rather, the people "may just think [Plaintiffs are] good Samaritans."

In a subsequent affidavit, Ohnimus testified that "In obedience to the demands of my faith and my conscience, I seek out neighbors in need of food, drink, companionship, and warmth so that I can address their needs and so that, through the acts of providing food, drink, blankets, hats, gloves, companionship, and prayer, I might communicate nonverbally to the recipients that God

11

loves and values them, regardless of their circumstances." In subsequent affidavits, Redlich attested that his religious obligation to provide food to the hungry includes "doing my best to meet the nutritional needs of the hungry people I am helping; my religious obligation cannot be fulfilled by providing only foods heavy in sodium, sugar, preservatives, or unhealthy fats." (Doc. 44-1, Second Redlich Aff. ¶ 2.) He provides sandwiches specifically because "sandwiches are more filling and provide the recipient a balance of fats, carbohydrates, and protein which, otherwise, the hungry person might not have available to them." (*Id.* at ¶ 3.) Redlich attested that if he encounters a person suffering from hunger, "my religious faith and my conscience compel me to try and act immediately to meet their need for food." (*Id.* at ¶¶ 47-48.)

On October 31, 2018, Plaintiffs distributed bologna sandwiches and bottled water to the homeless on the streets in the City. Plaintiffs did not set up religious banners or distribute religious literature that day. Plaintiffs were approached by police officers, and officer Stephen Ogunjobi issued both Plaintiffs a City Court Summons ("citation") to appear in court on December 4, 2018. The citation did not identify which ordinance was violated, but stated the alleged offense was "operating w/o permit," and that probable cause for arrest existed for "operating prepared food w/o proper permits." The citation further stated that "IF YOU FAIL TO APPEAR, A WARRANT MAY BE ISSUED FOR YOUR ARREST." The City's municipal prosecutors chose not to pursue charges against Plaintiffs regarding the citations issued on October 31, 2018.

Officer Ogunjobi filed an Incident Report after issuing the citation. The Incident Report stated that Officer Ogunjobi observed Ohnimus handing out prepared sandwiches from a cooler that did not have ice in it. The Incident Report also stated the City's health department created rules and regulations governing sidewalk vendors along with individuals that donate prepared food to homeless individuals and wants to make sure the homeless receive whole and safe food.

Representatives from the health department stated they would like officers to identify individuals breaking these rules so the health department can follow up and bring them to compliance.

The Ordinance applicable to Plaintiffs' food distribution activities is City Ordinance No. 68597 ("Ordinance"), which prohibits the distribution of "potentially hazardous foods" to the public without a temporary food permit. The Ordinance defines potentially hazardous foods to include "salads or sandwiches containing MEAT, POULTRY, EGGS, or FISH."

The Ordinance adopted Chapters 1 through 7 of the National Food Code. According to the text of the Ordinance, the U.S. Department of Health and Human Services, Public Health Service, and Food and Drug Administration publishes and supplements the National Food Code, which local governments may use in their regulation of food preparation and handling. The Ordinance further states that "the Board of Aldermen believes that it is in the best interest of the City, its residents and its visitors, to adopt portions of the most recent National Food Code as the basic ordinance concerning food preparation and handling." The Ordinance states that it promotes "its underlying purpose of safeguarding public health and ensuring that food is safe, unadulterated, and honestly presented when offered to the consumer."

The Ordinance includes requirements for providing temporary food service, including food handling, transport, and sanitation specifications. The prohibition on potentially hazardous foods does not apply to foods prepared and packaged under the conditions included in the temporary food service requirements. To obtain the temporary food service permit for a temporary food establishment, an applicant must have a portable hand-washing station and three food-grade washtubs—one with dishwashing detergent, one with clean rinse water, and one with approved sanitizer solution—as well as a 5-gallon or larger container of portable water, a "waste receptacle," and "hair coverings." A Temporary Food Establishment must also have an "overhead cover" or

shelter such as tents, canopies, or ceilings to cover the food preparation area. Each of these requirements has its origin in the National Food Code. For example, the three washtubs requirement is specific to situations where utensils are being used and complies with the Food Code's advisement of the need to clean, rinse, and sanitize utensils.

In order to obtain a temporary food permit, an applicant must fill out an application in person at the Health Department and pay a fee, which will be credited towards the permit fee. Generally, the Health Department requires 48-hours' notice of the event requiring the temporary food permit, but exceptions to this requirement are made regularly "for the benefit of City citizens." An applicant typically must provide either a vendor's license or a waiver from the License Collector's Office, or approval from the event organizer if within a festival zone. However, neither a license, waiver, or approval is required if the applicant is applying for a one-day event, or if other special circumstances exist. The application must contain the date and time of the event for which the permit is sought. This information allows a Health Department inspector to appear at the event and inspect the food to be distributed to ensure the food has been prepared and handled correctly.

On April 18, 2020, after this lawsuit was initiated, the Ordinance was amended by Ordinance No. 71106 ("Amendment"). The Amendment explains that it is designed to amend the City's temporary food permit process set forth in Ordinance 68597 in a way that continues to help assure public health and prevent foodborne illness. The Amendment recognizes "there are persons who want to help to feed the public free of charge, which could be facilitated through the provision of a reduced fee Charitable Feeding Temporary Food Permit Waiver and Temporary Food Safety Training. This is in recognition both of the good work of those feeding the hungry, but also recognizing that the hungry have the right to safe food, and the City of St. Louis has a legitimate

interest in protecting public health, regardless of whether there is a charge for the food or not." Pursuant to the Amendment, permits are required for potentially hazardous food because "[t]here is a need to know where there are charitable feeding operations in order to investigate a food-borne disease or outbreak." However, there is no permit required if the food is commercially pre-packaged non-potentially hazardous food.

Prior to the Amendment of the Ordinance, a temporary food permit cost fifty dollars per day of operation; after the amendment, the fee for charitable organizations to obtain a permit is twenty-five dollars per day. The permit fees may be used for the funding of the temporary food safety training program that permit holders are required to attend. Prior to the Amendment, temporary food service permits were limited to fourteen days per year; however, the Amendment eliminated the 14-day limitation for charitable feeding temporary food permits.

As early as 2012, the City received complaints from downtown residents regarding groups coming downtown and handing out food to the homeless. There were occasions where individuals had gotten sick as a result of the food distributed.

According to the Center for Disease Control's active surveillance network that monitors trends in foodborne illness, in 2018 alone, 5,893 people were hospitalized with foodborne illness, and 120 people died from foodborne illness. The CDC estimates that one in six people get sick from contaminated foods or beverages each year.

## III.   DISCUSSION

### A.   Standing and Mootness

Before addressing the parties' summary judgment arguments, it is necessary to address standing. Standing is a limitation on judicial power "and must be considered even if not raised by the parties." *Minn. Citizens Concerned for Life v. FEC,* 113 F.3d 129, 131 n.5 (8th Cir. 1997).

Plaintiffs' Complaint and motion for summary judgment seek an order prohibiting the City from enforcing Ordinance 68597 against Plaintiffs. Although the argument has not been raised by any party, now that Ordinance 68597, codified at  St. Louis City Code § 11.42.230, has been amended by Ordinance 71106, arguably Plaintiffs have not been cited for violating the law as it currently stands.

Additionally, shortly after the parties completed briefing on their cross motions for summary judgment, a new Ordinance went into effect—Ordinance 71324 (hereinafter, "the 2021 Ordinance"). The 2021 Ordinance states that as of ninety days after its adoption, or May 24, 2021, Ordinances 68597 and 71106 will be repealed. *See* St. Louis City Ordinance No. 71324 (February 23, 2021). The Court may take judicial notice of the 2021 Ordinance. *See Levy v. Ohl,* 477 F.3d 988, 991 (8th Cir. 2007) (explaining that district court may take judicial notice of public state records); and *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (stating that courts "may take judicial notice of judicial opinions and public records"). The Court will consider whether the adoption of the 2021 Ordinance renders Plaintiffs' request for injunctive relief moot.

In the First Amendment context, a plaintiff has standing to challenge a regulation—even if he has not been cited for violating it—if he intends to engage in speech prohibited by the regulation, "and there exists a credible threat of prosecution" if he does engage in such speech. *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *accord Republican Party of Minn. v. Klobuchar,* 381 F.3d 785, 792 (8th Cir. 2004) (plaintiff has standing to bring a pre-enforcement challenge to a regulation if he is "objectively reasonably chilled" from exercising his First Amendment rights because of the threat of criminal prosecution).

"Mootness is akin to the doctrine of standing because the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc) (internal quotations omitted). "When a law has been amended or repealed, [claims] seeking declaratory or injunctive relief for earlier versions are generally moot unless the problems are capable of repetition yet evading review." *Id.* (internal quotations omitted). If there is a "reasonable expectation" that an earlier version will be reenacted, a claim challenging that version is not moot. *Id.*

The Court has reviewed the 2021 Ordinance. Its stated purpose is, *inter alia,* to (1) repeal Ordinance 68597 and adopt as the new Food Code for the City the terms of the most recent 2017 Edition of the National Food Code; and (2) repeal the Amendment at Ordinance 71106 and "adopt the social justice/equity aspects of the revised Temporary Food Service provisions." Summary of Board Bill 207 for St. Louis City Ordinance 71324, January 8, 2021. The 2021 Ordinance still allows for a Charitable Feeding Temporary Food Permit, requires charitable feeding permit holders to participate in the Temporary Food Safety Training Program, and requires permit holders to comply with the National Food Code.

Given the procedural posture of this case, the current record before the Court does not disclose whether the City has begun enforcing the 2021 Ordinance, or if it intends to continue to enforce the recently repealed Ordinances 68597 and 71106. The record does not contain details regarding how enforcement of the 2017 National Food Code requirements, as opposed to the 2009 National Food Code requirements as briefed by the parties, would affect Plaintiffs' ability to continue their food sharing ministry. Assuming the 2021 Ordinance is being enforced, Plaintiffs would still be required to obtain a Charitable Feeding Temporary Food Permit at a cost of twenty-

five dollars per day in order to distribute bologna sandwiches or any other potentially hazardous food, and would still be subject to National Food Code requirements. Based on the record and the parties' summary judgment arguments, the Court finds that Plaintiffs have demonstrated an intent and desire to continue food sharing without obtaining a permit from the City and without complying with the requirements of the National Food Code's most recent edition. Upon the Court's review of the 2021 Ordinance, it finds that there is a credible threat of present or future enforcement against Plaintiffs. Plaintiffs' claims challenging the City's permit requirement as applied to Plaintiffs is not moot.

In ruling on the parties' motions, the Court will address the claims based on the facts as briefed by the parties, including based on the City's enforcement of the permitting and National Food Code requirements as they stood prior to the adoption of the 2021 Ordinance. Accordingly, references to "the Ordinance" refer to Ordinance 68597 and its Amendments incorporated by Ordinance 71106, unless otherwise specified.

### B.      Free Exercise of Religion (Count I)

The First Amendment, which is applicable to the States by incorporation into the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I; *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

Although the Free Exercise Clause continues to prohibit all "government regulation of religious beliefs" themselves, the United States Supreme Court's ruling in *Employment Division Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), has significantly diminished constitutional protection for *conduct* mandated by an individual's religious beliefs. In *Smith,* two individuals were denied unemployment benefits

because they had been fired for "work-related misconduct" for using peyote during Native American Church religious ceremonies, in violation of a neutral and generally applicable regulatory law. 494 U.S. at 874-76. The Supreme Court found no violation of their free exercise rights, as "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes… conduct that his religion prescribes…." *Id.* at 866-87.

Plaintiffs contend that the City's enforcement of the Ordinance makes it unlawful for Plaintiffs to fulfill their religious obligation to share food with hungry persons on the streets of St. Louis because Plaintiffs cannot reasonably comply with the City's regulatory requirements. (Doc. 1 at ¶ 47.) The City contends that requiring compliance with the Ordinance does not amount to a violation of Plaintiffs' rights under the Free Exercise Clause for several reasons. First, the Ordinance does not constitute a substantial burden on Plaintiffs' sincerely-held religious beliefs, such that it does not trigger First Amendment concerns. Second, the Ordinance is neutral and a law of general applicability that is subject to a rational basis review, which the Ordinance withstands.

Plaintiffs state they "have acknowledged from the outset that under the U.S. Supreme Court's current interpretation of the Free Exercise Clause, they cannot prevail on a stand-alone Free Exercise claim."[6] (Doc. 45 at 13.) Plaintiffs instead seek summary judgment on their Free Exercise claim under the "hybrid rights" doctrine, a theory this court will address *infra.* The Court will nevertheless conduct a standalone Free Exercise analysis,  because it is relevant to Plaintiffs' other claims.

---

[6] Plaintiffs "still wish to preserve for review the question of whether *Employment Division [Department of Human Resources of Oregon v. Smith]* should be overturned." *Id.* However, this court is bound by Supreme Court precedent and finds that *Smith* and subsequent caselaw foreclose Plaintiffs' standalone Free Exercise claim.

### 1. Substantial Burden

Under either a direct burden or a "hybrid rights" analysis, *Smith* and subsequent caselaw establish that before a court is even to analyze whether the law is neutral and/or generally applicable, there must be a burden on religious exercise. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). "[The] Government significantly burdens the exercise of religion if it significantly constrains conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtails the ability to express adherence to a particular faith, or denies reasonable opportunities to engage in fundamental religious activities." *Altman v. Minnesota Dep't of Corr.*, 251 F.3d 1199, 1204 (8th Cir. 2001). "The Free Exercise Clause requires only that [government action] be neutral and generally applicable; incidental burdens on religion are usually not enough to make out a free exercise claim." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018).

Plaintiffs do not address the substantial burden threshold in the context of their Free Exercise claim. However, in moving for summary judgment on their state law claim on Missouri's Religious Freedom Restoration Act ("MRFRA"), they argue that applying the Ordinance to Plaintiffs restricts their exercise of religion by making it "more expensive, more difficult, less frequent, and less effective." (Doc. 38 at 9.) Plaintiffs argue that the Ordinance's various requirements to obtain a permit impermissibly restrict Plaintiffs' ability to fulfill their religious obligation to share food with hungry persons, and that they cannot reasonably comply with the City's permitting and regulatory requirements. For example, Plaintiffs argue that they share food three to five days per week, and to obtain a permit to continue this practice would cost roughly $7,500 per year. Plaintiffs argue the Ordinance would only allow Plaintiffs to share food fourteen days per year, reducing their food-sharing dates by more than 90 percent. Plaintiffs contend they

cannot continue their current practice of seeking out those in need and serving them where they are found because the Ordinance requires a temporary food establishment to have on site a portable hand-washing facility, food-grade washtubs, and shelter to be placed over the food. Plaintiffs argue they would also be required to remain at only a single fixed location, but many of the people Plaintiffs serve have physical or psychological conditions that make it difficult for them to travel to and from such a location.

The City responds that Plaintiffs' argument ignores the nuance that the Ordinance only applies to "potentially hazardous foods," and so, Plaintiffs cannot establish a substantial burden to their free exercise rights. The City further argues that Plaintiffs acknowledge there is nothing about the exercise of distributing bologna sandwiches, as compared to other food, that inherently expresses their religion. The City also argues that Plaintiffs failed to present evidence that they cannot afford the cost of a permit and accompanying equipment and failed to explain why they cannot comply with the other Ordinance requirements,

The Eighth Circuit has consistently found that financial or logistical incidental burdens do not constitute substantial burdens to free exercise rights. *See, e.g., Donovan v. Tony & Susan Alamo Found.*, 722 F.2d 397, 403 (8th Cir. 1983*), aff'd sub nom. Tony & Susan Alamo Found. v. Sec'y of Lab.,* 471 U.S. 290, 105 S. Ct. 1953, 85 L. Ed. 2d 278 (1985) (*citing Braunfeld v. Brown,* 366 U.S. 599, 605-606, 81 S.Ct. 1144, 1146-1147, 6 L.E.2d 563 (1961) ("[T]he Supreme Court has squarely held that legislation otherwise legitimate does not violate the Free Exercise Clause merely because financial detriment results."); *Marianist Province of United States v. City of Kirkwood,* 944 F.3d 996, 1001 (8th Cir. 2019) ("We agree with other circuits that have concluded requiring a religious institution to use feasible alternative locations for religious exercise does not constitute a substantial burden."); *Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1042 (D.

Minn. 2016) ("Although the ban may impose monetary and logistical burdens on the Church, it does not prevent the Church's members from worshipping or engaging in activities central to their religious beliefs. Indeed, it merely prevents the Church from using a specific property for religious worship.").

Here, the Court similarly finds that Plaintiffs have not established that the Ordinance constitutes a substantial burden on their free exercise rights. Assuming that food sharing is a central tenet of Plaintiffs' religious beliefs, the evidence does not show that enforcement of the Ordinance prohibits Plaintiffs' meaningful ability to adhere to their faith or denies Plaintiffs reasonable opportunities to engage in fundamental religious activities. Plaintiffs are not being forced to violate their religious beliefs. Rather, the Ordinance requires that Plaintiffs obtain a permit and follow the National Food Code rules incorporated into the Ordinance if they wish to continue distributing bologna sandwiches or other foods that fall under the Ordinance's definition of "potentially hazardous foods." Plaintiffs have not shown that to obtain a permit or forego distribution of potentially hazardous foods would substantially burden their religious exercise. In fact, Plaintiffs' arguments are weakened by the City's Amendment to the Ordinance, which lessens the financial and logistical burdens for those seeking a Charitable Feeding Temporary Food Permit. The Amendment lowers the permit fee and waives the 14-day limit for charitable operations such that Plaintiffs could continue to share food three to five days per week.[7] Additionally, Plaintiffs have not shown that their food sharing ministry requires the distribution of potentially hazardous foods as opposed to other foods. Plaintiffs show that the Ordinance certainly limits their ability to express

---

[7] Plaintiffs' estimate that they would incur $7,500 in permit fees per year assumes that they food-share for 150 days per year and pay $50 per day in fees. The Amendment lowers the permit fee for charitable organizations to $25 per day of operation, lowering the annual fees incurred to $3,750 if Plaintiffs choose to distribute potentially hazardous foods 150 days per year.

their message in distributing sandwiches, but admit there is nothing about bologna sandwiches specifically that inherently expresses their religion. The facts show that in the alternative to obtaining a charitable feeding permit, Plaintiffs can and have distributed other types of food, bottled water, clothes, literature, and offered community and prayer without providing food subject to the Ordinance. Because Plaintiffs have not demonstrated that complying with the Ordinance or availing themselves of food sharing ministry alternatives that do not implicate the Ordinance would substantially burden their religious exercise, they cannot show a substantial burden implicating the Free Exercise Clause.

### 2.   Neutral & Generally Applicable

Assuming a substantial burden to religion exists, the law must be examined to determine the level of scrutiny to apply. A regulatory law that is both neutral and generally applicable passes constitutional muster under *Smith,* even though it may require performance of an act—or abstention from conduct—in contradiction to an individual's religious beliefs. *Smith,* 494 U.S. at 878-80. "Neutrality and general applicability are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.*

Other courts have found that laws regulating food distribution are neutral laws of general applicability. *See, e.g., Krishna Lunch of S. California, Inc. v. Gordon*, 797 F. App'x 311, 314 (9th Cir. 2020) (UCLA's policy limiting the number of events in which off-campus organizations may serve prepared food is both facially neutral and generally applicable); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 2019 WL 10060265, at *12 (S.D. Fla. Aug. 16, 2019) (ordinance regulating outdoor temporary food distribution centers was content neutral and generally applicable). Here, the challenged Ordinance is neutral on its face, i.e., it does not "infringe upon or restrict practices because of their religious motivation." *See Church of the Lukumi Babalu Aye,*

*Inc. v. City of Hialeah,* 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). The Ordinance is also generally applicable because it does not selectively "impose burdens only on conduct motivated by religious belief." *See id.* at 543. The text of the Ordinance states it adopts the National Food Code as the basic ordinance concerning food preparation and handling because the Code "reflects current scientific knowledge of practices and facilities conducive to safe food preparation and handling," which the Board of Aldermen believes is in the best interest of the City. The text of the Amendment to the Ordinance states that "there are persons who want to help feed the public free of charge," and institutes a "reduced fee Charitable Feeding Temporary Food Permit Waiver and Temporary Food Safety Training… in recognition both of the good work of those feeding the hungry, but also recognizing that the hungry have the right to safe food and the City of St. Louis has a legitimate interest in protecting public health, regardless of whether there is a charge for the food or not." The Ordinance's stated purpose of food safety is for the promotion of public health and safety, not to interfere with religious practices. Additionally, the inclusion in the Amendment of a reduced permit fee for charitable organizations signals the City's desire to avoid impinging on food distribution as a charitable act, regardless of whether the act is religiously motivated. The record supports that the City enacted the Ordinance to adopt the National Food Code for public health and safety reasons, not to curtail a religious message. Thus, the Ordinance and its Amendment are content neutral and generally applicable.

### 3. Rational Basis Review

Neutral and generally applicable laws receive rational basis review. *See Church of the Lukumi Babalu Aye, Inc.,* 508 U.S. at 531 ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."). The Ordinance will be upheld if it is rationally

related to a legitimate state purpose. *See Doe v. Parson,* 960 F.3d 1115, 1119 (8th Cir. 2020) ("Doe makes no argument, however, that the informed-consent law is anything other than 'neutral' and 'generally applicable.' In these circumstances, is must only survive rational-basis review, which requires it to be 'rationally related to a legitimate government interest.'").

Under the rational basis test, the Ordinance carries a "strong presumption of validity" and the City is given "wide latitude" to enact social and economic policies if there is any reasonably conceivable state of facts that could provide a rational basis for the enactment's classifications. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Legislative choices are not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data. *Heller v. Doe by Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Here, Plaintiffs have not and cannot argue there is no rational or conceivable basis to support the Ordinance. The City's desire to prevent foodborne illness is clearly a legitimate purpose, and requiring a permit in order to distribute potentially hazardous foods is rationally related to said purpose. While Plaintiffs argue the City selectively enforces the Ordinance based on whether or not food is shared with homeless persons, there is no evidence that the Ordinance or enforcement thereof is motivated by masked intent to discriminate against a particular religion. *See Church of the Lukumi Babalu Aye, Inc.,* 508 U.S. at 534, 113 S. Ct. 2217. In fact, the Ordinance's Amendment reflects an effort to accommodate those who wish to share food with the homeless because it reduces the permit fee for charitable food distribution and waives the 14-day limit for charitable food operations. The plain language of the Amendment's preamble states "[t]his is in recognition both of the good work of those feeding the hungry, but also recognizes that the hungry have the right to safe food, and

the City has a legitimate interest in protecting public health, regardless of whether there is a charge for the food or not." The permit application allows the City to know the location and time of any food distribution so that a Health Department inspector can appear at the event to ensure the food has been prepared and handled in accordance with the Food Code. The Court finds that the Ordinance passes a rational basis review, and grants the City's motion for summary judgment on Plaintiffs' Free Exercise claim.

### C.    Freedom of Speech/Expression (Count II)

The First Amendment, which applies to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. However, the right to free speech "is not absolute," *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 1707, 152 L. Ed. 2d 771 (2002), and the First Amendment does not prevent restrictions directed at conduct which imposes incidental burdens on speech. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011).

Plaintiffs allege their freedom of speech was violated because sharing food with the homeless is expressive conduct Plaintiffs use "to communicate their message about God's love and concern for even the dispossessed and 'the least of these.'" (Doc. 1, ¶ 60.) Plaintiffs claim the Ordinance unconstitutionally restricts Plaintiffs' freedom of expression, and the Court should apply a strict scrutiny analysis to the Ordinance under the hybrid rights theory. Plaintiffs argue that alternatively, if the Court declines to apply strict scrutiny under *Smith*, it must apply the test set forth in *U.S. v. O'Brien*, 391 U.S. 367 (1968), to determine if the City's application of the Ordinance improperly restricts Plaintiffs' freedom of expression. The City first argues Plaintiffs' distribution of sandwiches to the homeless is not inherently expressive conduct. Second, the City

argues that even if it does constitute expressive conduct, the Ordinance was not directed at any speech or religious exercise and it passes the *O'Brien* test and strict scrutiny review.

### 1. Expressive Conduct

The Court will first address whether Plaintiffs have engaged in expressive conduct warranting First Amendment protection. While the Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech,'" *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), it is well-established that the First Amendment's protection "does not end at the spoken or written word," *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). "[N]on-expressive conduct is not afforded First Amendment protection." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). Courts employ a two-part inquiry to determine whether conduct is sufficiently expressive under the First Amendment. First, the court considers whether "[a]n intent to convey a particularized message was present" and second, whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n.5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Plaintiffs must advance more than a mere "plausible contention" that their conduct is expressive. *See id.* As the Supreme Court explained in *Clark*:

> Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive. In the absence of a showing that such a rule is necessary to protect vital First Amendment interests, we decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it.

*Id.* at 293 n.5.

Plaintiffs rely on the Eleventh Circuit decision in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* for the proposition that publicly sharing food with the homeless constitutes expressive conduct protected by the First Amendment. 901 F.3d 1235, 1238 (11th Cir. 2018). In *Food Not Bombs*, the district court granted summary judgment to the City, finding outdoor food sharing was not expressive conduct because it "does not convey [plaintiff's] particularized message unless it is combined with other speech, such as that involved in [plaintiff's] demonstrations." *Id.* at 1241. The Eleventh Circuit reversed, finding that the district court's focus on plaintiff's particularized message was mistaken, because a prior Eleventh Circuit case imparted that "the inquiry is whether the reasonable person would interpret [plaintiff's] food sharing events as '*some* sort of message,'" not whether an observer would infer a *specific* message. *Id.* at 1241-42 (*quoting Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1270 (11th Cir. 2004)) (emphasis in original). The Eleventh Circuit explained:

> Here, the presence of banners, a table, and a gathering of people sharing food with all those present in a public park is sufficiently expressive. The reasonable observer at FLFNB's events would infer some sort of message, e.g., one of community and care for all citizens. Any "explanatory speech"—the text and logo contained on the banners—is not needed to convey that message. Whether those banners said "Food Not Bombs" or "We Eat With the Homeless" adds nothing of legal significance to the First Amendment analysis. The words "Food Not Bombs" on those banners might be required for onlookers to infer FLFNB's *specific* message that public money should be spent on providing food for the poor rather than funding the military, but it is enough if the reasonable observer would interpret the food sharing events as conveying "some sort of message."

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1244 (11th Cir. 2018).

The City attempts to distinguish *Food Not Bombs* in several ways. First, the City argues that the Eleventh Circuit's holding that the proper inquiry to determine inherently expressive

28

conduct was whether the conduct expressed *some sort* of message, "which is a much more lenient standard" than that used by the Supreme Court in *Rumsfeld* and in district courts within the Eighth Circuit. However, the undersigned remains unconvinced that the Eleventh Circuit's application of the *Spence* test is inconsistent with the Eighth Circuit's application. Notably, the cases relied upon by the City address "compelled speech" arguments, wherein the plaintiffs allege that the regulations at issue impose funding conditions or mandate conduct that either compels or deprives plaintiffs of constitutionally-protected speech. *See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. ("FAIR")*, 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (law denying federal funding to law schools unless they allowed military recruiters to have equal access to campus did not implicate First Amendment because the plaintiffs' restriction of military recruiting on campus to express opposition to the military's then-existing "Don't Ask, Don't Tell" policy was not inherently expressive conduct); *Wieland v. United States Dep't of Health & Hum. Servs.*, No. 4:13-CV-01577-JCH, 2016 WL 98170, at *6 (E.D. Mo. Jan. 8, 2016) (rejecting plaintiffs' argument that the Affordable Care Act's requirement to fund contraceptives is inherently expressive conduct because "giving or receiving of health care—which at the discretion of individual doctors and patients may or may not involve education and counseling regarding contraceptives—is not inherently expressive conduct"); *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617, 624 (E.D. Ark. 2019) (relying on *Rumsfeld* in deciding that the decision to engage in a boycott of Israel is "expressive only if it is accompanied by explanatory speech"), *rev'd and remanded,* 988 F.3d 453 (8th Cir. 2021), *reh'g en banc granted, opinion vacated* (June 10, 2021). Here, the Ordinance and its food permit requirements do not impose any sort of funding mandate on Plaintiffs (*Wieland*) or impose a funding condition (*Rumsfeld, Arkansas Times*) that burdens Plaintiffs' conduct. The

City's cases provide guidance as to what constitutes expressive conduct in the context of compelled speech, but they are distinguishable from the issues presented here.

The City also argues that unlike the *Food Not Bombs* plaintiffs, here Plaintiffs did not set up tables and banners or distribute literature. Also unlike *Food Not Bombs,* Plaintiffs and the homeless did not partake in a meal together at the same time; here Plaintiffs left the area after they distributed food. Although *Food Not Bombs* is not precedential to this Court, it is instructive. The City's argument regarding factual distinctions in *Food Not Bombs* ignores the substance of Plaintiffs' challenge. The City focuses on the facts related to the food sharing on October 31, 2018, the day Plaintiffs were issued a citation by Officer Ogunjobi. However, Plaintiffs' claims do not only relate to their conduct or speech *on that day.* Although Plaintiffs did not hand out literature or have banners or eat with the homeless on the day they were cited, Plaintiffs testified that they seek out the homeless for food distribution several days a week. In addition to food and drink, Plaintiffs offer companionship and prayer. Plaintiffs hand out flyers. Redlich testified that he frequently tells those with whom he shares food that he is doing so in Jesus' name, and that he sometimes provides faith-related written materials to homeless persons. Plaintiffs are not seeking damages for a single, past First Amendment violation; rather, they are bringing an as-applied challenge to prevent further injury by enjoining the City from enforcement of the Ordinance against Plaintiffs because they seek to engage in protected conduct in the future.

The facts in this case leave no question as to the first prong of *Spence*—Plaintiffs clearly had the subjective intent to convey a particularized message with their "food sharing ministry." Plaintiffs intended to worship and show that God loves and values the homeless. However, whether the surrounding circumstances are such that the message would likely be understood by those who viewed it is a closer question. Ohnimus admitted during his deposition that people who pass by

would not know Plaintiffs are distributing food because of their religious beliefs, and they might just think Plaintiffs are good Samaritans. In any event, the Court need not decide whether Plaintiffs' food sharing constitutes expressive conduct because Plaintiffs' free speech claim fails on other grounds. *See, e.g., Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks,* 864 F.3d 905, 913 n.4 (8th Cir. 2017) ("Because Havlak's constitutional claim fails under the "most exacting test" of First Amendment expression, we need not decide whether her photography qualifies as expressive conduct…").

### 2.  Intermediate Scrutiny Review

Assuming Plaintiffs' conduct is protected by the First Amendment, the level of scrutiny to apply is determined by whether the Ordinance is related to the suppression of expression. *See Texas v. Johnson*, 491 U.S. 397, 412, 109 S. Ct. 2533, 2544, 105 L. Ed. 2d 342 (1989). "If the governmental purpose in enacting the ordinance is unrelated to such suppression, the ordinance need only satisfy the 'less stringent' intermediate *O'Brien* standard." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 278, 120 S. Ct. 1382, 1385, 146 L. Ed. 2d 265 (2000). If the governmental interest is related to the expression's content, however, the ordinance falls outside *O'Brien* and must be justified under the more demanding, strict scrutiny standard. *Id.*

In Plaintiffs' motion for summary judgment, they seem to concede that the Ordinance requiring a temporary food service permit falls under the category of "religiously-neutral, generally-applicable laws that incidentally burden a person's religious practice." (Doc. 38 at 15.) Therefore, assuming the Ordinance imposes an incidental burden on Plaintiffs' speech, the content-neutral regulation is subject to intermediate scrutiny under the *O'Brien* test.[8]

---

[8] Plaintiffs dispute that *O'Brien* is the appropriate test in light of their hybrid rights theory argument discussed *infra*.

When "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. *United States v. O'Brien,* 391 U.S. at 376-77, 88 S.Ct. at 1679. Under the *O'Brien* test, a content-neutral regulation does not violate the First Amendment "[1] if it furthers an important or substantial governmental interest; [2] if the governmental interest is unrelated to the suppression of free expression; and [3] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662, 114 S. Ct. 2445, 2469, 129 L. Ed. 2d 497 (1994) (quoting *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673). The third requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting  *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746 105 L.Ed.2d 661 (1989)).

The City argues that the government interest of preventing foodborne illness is important and substantial, is unrelated to the suppression of free expression, and the Ordinance furthers the prevention of foodborne illness. The City further argues that the incidental restrictions of prohibiting distribution of potentially hazardous food without a temporary food permit is essential to the furtherance of preventing foodborne illness. Plaintiffs respond that there is no evidence to show Plaintiffs' food distribution approach poses any significant threat of foodborne illness. Plaintiffs argue that the Ordinance cannot satisfy the *O'Brien* test because a burden on expression that is unlikely to actually change the number of foodborne illnesses in the City cannot be considered "essential to the furtherance" of the government's asserted interest.

The Court finds that the Ordinance meets the *O'Brien* test.  First, the City has identified the important and substantial government interest of prevention of foodborne illness. *See, e.g.,*

32

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, No. 15-60185-CIV, 2019 WL 10060265, at *8 (S.D. Fla. Aug. 16, 2019) (ordinance restricting food sharing as a social service served significant government interests including unsafe food service and unsanitary conditions); *American Meat Institute v. U.S. Dep't of Agriculture,* 760 F.3d 18, 23 (D.C. Cir. 2014) ("the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak" is a substantial government interest motivating mandated disclosure of country-of-origin information about meat products); *Players, Inc. v. City of New York*, 371 F. Supp. 2d 522, 538 (S.D.N.Y. 2005) (City had a substantial government interest in ensuring the health of its food supply and of customers of food service establishments). Second, the prevention of foodborne illness is wholly unrelated to the suppression of Plaintiffs' religious expression. As is discussed above, the Ordinance is content neutral, and it is justified by health concerns unrelated to expression. Third, requiring a permit to distribute potentially hazardous food so that the City may regulate when and where the food service takes place plainly serves the City's important and substantial government interest of preventing foodborne illness. *See., e.g., Clark v. Cmty. for Creative Non-Violence*, 468 U.S. at 299, 104 S. Ct. at 3072 (regulation against camping or overnight sleeping in public park serves to limit the wear and tear on park properties, promoting the substantial government interest in conserving park property); *Davis v. Norman,* 555 F.2d 189, 191 (8th Cir. 1977) (ordinance requiring enclosed storage of abandoned or inoperable motor vehicles serves the basic purpose of protecting the community from health and safety hazards, furthering important and substantial government interests).

The Court is not persuaded by Plaintiffs' argument that the record "show[s] no reason whatsoever" to suspect Plaintiffs' approach to feeding the homeless poses a significant threat to foodborne illness. Where a content-neutral restriction that regulates conduct is at issue under

*O'Brien,* the courts hold that "the government should have sufficient leeway to justify such a law based on secondary effects." *City of Erie v. Pap's A.M.,* 529 U.S. at 295, 120 S. Ct. at 1396 ("As we have said, so long as the regulation is unrelated to the suppression of expression, the government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.") (internal quotations omitted); *see also Hill v. Colorado,* 530 U.S. 703, 725–26, 120 S. Ct. 2480, 2494, 147 L. Ed. 2d 597 (2000) ("[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrict or least intrusive means of serving the statutory goal."); *Clark,* 468 U.S. at 299, 104 S. Ct. 3065 (rejecting argument that a regulation banning sleeping in the park was unnecessary because there are less speech-restrictive alternatives that could satisfy the government interest in preserving park lands). Accordingly, the Ordinance satisfies the *O'Brien* test.[9] The Court grants the City's motion for summary judgment on Plaintiffs' Free Speech claim.

## D.     Equal Protection of Laws and Freedom of Association (Count III)

The equal protection clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne,* 473 U.S. at 439, 105 S.Ct. at 3254. "As a threshold

---

[9] The Court notes that neither party makes any argument regarding whether the Ordinance's limitations on food distribution constitute a valid "time, place, or manner" restriction, instead framing the issues under the *O'Brien* test used for symbolic conduct. The "time, place, or manner" test was developed for evaluating restrictions on expression taking place on public property which has been dedicated as a "public forum." *See Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2753; *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The Supreme Court has stated that the "time, place, or manner" analysis "has been interpreted to embody much the same standards as those set forth in *United States v. O'Brien*." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S. Ct. 2456, 2460, 115 L. Ed. 2d 504 (1991); *Clark,* 468 U.S. at 299, 104 S. Ct. at 3072 (in validating a regulation of expressive conduct under *O'Brien* there "is little, if any, differen[ce] from the standard applied to time, place, or manner restrictions"). For the reasons discussed above under *O'Brien,* the Court finds that the Ordinance's limitations on food distribution also constitute reasonable time, place, or manner restrictions. *See, e.g., Fort Lauderdale Food Not Bombs*, 2019 WL 10060265, at *10 ("Plaintiffs can spread their messages in Stranahan Park, among other venues, without food sharing and without violating the Ordinance or the Park Rule. Ample alternative channels of communication exist, and the essential restrictions imposed by the Ordinance and the Park Rule therefore satisfy all criteria necessary to make them lawful time, place, or manner restrictions.")

matter, in order '[t]o state an equal protection claim, [a plaintiff] must have established that he was treated differently from others similarly situated to him.'" *Carter v. Arkansas,* 392 F.3d 965, 968 (8th Cir. 2004) (*quoting Johnson v. City of Minneapolis,* 152 F.3d 859, 862 (8th Cir. 1998)). If a statute treats citizens differently based on a suspect classification or involves a fundamental right, the challenged law receives heightened scrutiny. "Where a law neither implicates a fundamental right nor involves a suspect or quasi-suspect classification, the law must only be rationally related to a legitimate government interest. *Gallagher v. City of Clayton,* 699 F.3d 1013, 1019 (8th Cir. 2012) (internal citations omitted). "Such a law is 'accorded a strong presumption of validity,' and is upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (*quoting Heller v. Doe,* 509 U.S. at 319, 113 S.Ct. 2637, *and F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. at 313, 113 S.Ct. 2096).

Count III of Plaintiffs' Complaint alleges that the City's selective, discriminatory enforcement of the Ordinance against Plaintiffs creates a differential treatment that affects Plaintiffs' right to associate with homeless persons, implicating their freedom to associate under the First Amendment. In the alternative, Plaintiffs allege the City's application of the Ordinance also violates the Equal Protection Clause because it denies homeless persons the freedom to make

choices that all other persons enjoy when it comes to accepting food freely.[10] The City moved for summary judgment on Count III, arguing the Ordinance does not substantially burden Plaintiffs' right to association or equal protection. The City alternatively argues that the Ordinance satisfies rational basis and strict scrutiny review. Plaintiffs did not move for summary judgment on Count III. In response to the City's motion, they argue that although the Ordinance appears to treat all citizens equally on its face, the City selectively enforces the Ordinance when potentially hazardous food is shared with homeless persons.

Although the right of expressive association is not an express constitutional guarantee, the right to engage in expression under the First Amendment implies "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

Here, Plaintiffs do not provide legal authority to support their argument that their fundamental right to association is at issue. However, Plaintiffs rely heavily on *Fort Lauderdale Food Not Bombs* in support of their other First Amendment claims. In that case, the Eleventh Circuit reversed the lower court's grant of summary judgment to the City of Fort Lauderdale,

---

[10] Although Plaintiffs frame this freedom of association claim as an equal protection violation, they limit their equal protection arguments on summary judgment to the City's application of a law in a manner that impinges on a fundamental right—freedom of association—rather than arguing the Ordinance treats a suspect classification of people differently than similarly situated individuals. *Cf. Gallagher*, 699 F.3d at 1019 (affirming dismissal of equal protection claim against City's enforcement of smoking ban where plaintiff attempted to argue smokers are a suspect or quasi-suspect class due "to discrimination, animus, stigma and second class characterization"). Plaintiffs also declined to raise legal arguments based on their allegation that the Equal Protection Clause denies homeless persons the freedom to make choices regarding accepting free food. (*See* Doc. 1, ¶¶ 82-83.) To the extent Plaintiffs intended to bring an equal protection claim based on the City's alleged denial of equal protection rights to homeless persons, Plaintiffs have not established Article III standing to bring such a claim. *Gray v. City of Valley Park, Mo.*, No. 4:07CV00881 ERW, 2008 WL 294294, at *21 (E.D. Mo. Jan. 31, 2008), *aff'd*, 567 F.3d 976 (8th Cir. 2009) (plaintiffs did not have standing to bring equal protection claim based on discrimination against third parties). Additionally, Plaintiffs have not alleged that the homeless are a suspect class, nor has the Court found an Eighth Circuit case holding homeless persons to be a suspect class. *See Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1108 (E.D. Cal. 2012) (collecting cases within the Third, Ninth, and Eleventh Circuits that "have refused to define homeless persons as a suspect class"). Like Plaintiffs, the Court will similarly decline to analyze these potential bases for an equal protection claim.

holding food sharing activity was protected by the First Amendment. On remand, the district court

took up the remainder of the parties' cross motions for summary judgment, including the issue of

whether the ordinance and park rules violated plaintiffs' right to association. The ordinance and

rule at issue forbid the provision of food as a social service in city parks without written permission

and barred outdoor food sharing events in Stranahan Park without a permit. *Fort Lauderdale Food*

*Not Bombs v. City of Fort Lauderdale*, 2019 WL 10060265, at *1 (S.D. Fla. Aug. 16, 2019).  The

district court explained,

> Plaintiffs argue that by restricting their ability to promulgate their message via food
> sharing, and by enforcing the Ordinance and the Park Rule based on "who is
> associating with whom," Defendant violates Plaintiffs' expressive association
> rights. DE 41, p. 19.
> Plaintiffs' argument that the restrictions imposed by the Ordinance and the Park
> Rule by themselves violate their expressive association rights is a non-
> starter. Simply preventing Plaintiffs from sharing food as a social service in certain
> venues is not an attack on their rights of expressive association. Under the
> Ordinance and the Park Rule, the members of Plaintiff FFNB remain free to
> associate with each other and with anyone whom they invite to take part in their
> demonstrations. The fact that a restriction is placed on a particular method of
> expression at said demonstrations does not impair this freedom of association.

*Id.* at *13.

Here, Plaintiffs' argument similarly cannot carry the day. Plaintiffs point to an affidavit

provided by Redlich wherein he states that he and others have shared potentially hazardous foods

with non-homeless people in private and public settings within the City such as his home or

backyard, picnics in public locations, potluck dinners, school gatherings, and tailgates. Yet Redlich

does not recall ever seeing a City official tell those sharing foods with non-homeless persons that

they were required to obtain permits from the City. "Those non-homeless persons being offered

food were free to decide for themselves whether to partake of it." (Doc. 50-6, at 30.) Plaintiffs

argue this shows the City enforces the permit requirement when sharing food with homeless

persons and not when food is shared with non-homeless persons, "penalizing certain citizens based

on the people with whom they associate." However, the Ordinance does not prevent Plaintiffs from associating with the homeless, nor does it punish them for doing so. Plaintiffs may continue to associate with the homeless and to provide companionship and prayer to the homeless. Plaintiffs may even provide food during their association. The Ordinance simply requires that if the food shared is potentially hazardous, Plaintiffs must first obtain a permit and follow the Ordinance's requirements. Because Plaintiffs cannot establish a violation of their associational rights, there is no fundamental right infringed upon by the alleged differential treatment in requiring a permit to distribute food to the homeless. Plaintiffs cannot establish a violation of their equal protection or associational rights, and the Court grants the City's motion for summary judgment as to Count III.

### E.      Hybrid Rights Theory (Counts I and II)

Plaintiffs argue they are entitled to summary judgment on their Free Exercise and Free Speech claims under the "hybrid rights" doctrine. As discussed above, in *Employment Div., Dep't of Human Res. of Oregon v. Smith*, "the Court held that a neutral law of general applicability that incidentally impinges on religious practice will not be subject to attack under the free exercise clause." *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir. 1991) *citing Smith,* 494 U.S. at 879, 110 S.Ct at 1600. However, the *Smith* Court explained that prior decisions where the First Amendment barred application of a neutral, generally applicable law to religiously motivated action involved hybrid situations in which a free-exercise challenge was intertwined with another constitutional right. *Smith,* 494 U.S. at 882, 110 S. Ct. 1595.

After *Smith* was decided, lower courts have used varying approaches in deciding "hybrid rights" claims, and some courts refuse to recognize the doctrine without additional clarification from the Supreme Court. *See, e.g., Parents for Privacy v. Barr*, 949 F.3d 1210, 1236 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894, 208 L. Ed. 2d 452 (2020) ("The extent to which the hybrid

rights exception truly exists, and what standard applies to it, is unclear."); *Mahoney v. D.C.*, 662 F. Supp. 2d 74, 95 (D.D.C. 2009), *aff'd sub nom. Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011) ("Plaintiffs may not, however, raise a 'hybrid claim,' because they do not have an independently viable claim under the Speech Clause."); *Kissinger v. Bd. of Trustees of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993) ("at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard than that used in *Smith* to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause"); *Miller v. Reed,* 176 F.3d 1202, 1207 (9th Cir. 1999) ("a plaintiff does not allege a hybrid-rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right or a claim of an alleged violation of a non-fundamental or non-existent right."); *see also Douglas Cty. v. Anaya*, 269 Neb. 552, 558, 694 N.W.2d 601, 606 (2005) ("A party may not force the government to meet the strict scrutiny standard by merely asserting claims of violations of more than one constitutional right.").

The Eighth Circuit has held that strict scrutiny is the appropriate analysis for a claim under the "hybrid rights" doctrine. *See Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). In *Cornerstone Bible Church v. City of Hastings,* the Eighth Circuit reviewed a zoning ordinance restricting the location of a church from the town's central business district. 948 F.2d 464, 466 (8th Cir. 1991). The district court found that the ordinance did not violate the Church's rights to free exercise, due process, or equal protection, and "[b]ecause plaintiffs have failed to establish a violation of another constitutional right, their free exercise claim alone is not sufficient to establish a cause of action." *Cornerstone Bible Church v. City of Hastings, Minn.*, 740 F. Supp. 654, 670 (D. Minn. 1990). In reversing summary judgment on the free speech and equal protection claims,

the Eighth Circuit "breathe[d] life back into the Church's 'hybrid rights' claim" and instructed the district court to consider the claim on remand, even though the Court affirmed the rejection of plaintiff's standalone free exercise claim. *Id.* at 473.

In *Telescope Media Group v. Lucero,* the Eighth Circuit again recognized the hybrid rights doctrine, this time in a case involving two wedding videographers who declined services to same-sex individuals because it conflicted with their beliefs. 936 F.3d 740 (8th Cir. 2019). Relying on provisions of the Minnesota Human Rights Act (MHRA), the State of Minnesota mandated the videographers make wedding videos for *any* couple, regardless of the videographers' beliefs and the message they wish to convey. *Id.* at 748. The videographers raised free speech and free exercise claims, among others, which were dismissed by the district court for failure to state a claim. The Eighth Circuit determined that the videos plaintiffs created were speech, not conduct, such that Minnesota's interpretation of the law operated as content-based regulation of speech. Once the plaintiffs' free speech claim was revived, the Court considered whether the plaintiffs sufficiently alleged a free exercise claim. *Id.* at 758-759. The plaintiffs alleged they will have to either show support for same-sex marriage, even though they object to it on religious grounds, or refrain from making wedding videos at all, such that the MHRA prevents them from freely exercising their religious beliefs. The Eighth Circuit noted the videographers free-exercise claim was not a typical free exercise claim because "[t]hose seeking relief under the Free Exercise Clause of the First Amendment will ordinarily argue that their religion requires them to engage in conduct that the government forbids or forbids certain conduct that the government requires." *Id.* Here, the Eighth Circuit noted, the videographers were arguing "the MHRA burdened their religiously motivated *speech*, not their religious *conduct*," and on this basis, their claim falls into the "hybrid-situation[.]" *Id.* (emphasis in original).

In both Eighth Circuit cases recognizing the hybrid rights doctrine, the Court found that the plaintiffs had an independently viable First Amendment claim separate from the hybrid Free Exercise claim. That is not the case here. Plaintiffs have not established a standalone free exercise claim, nor have they established a violation of another constitutional right. Thus, they have failed to establish a basis to apply the hybrid rights doctrine. *See, e.g., Wieland,* No. 4:13-CV-01577-JCH, 2016 WL 98170, at \*5 n.2 ("Because the Court finds that Plaintiffs have also failed to state claims under the Due Process and Free Speech Clauses, the Court rejects their hybrid-rights theory."); *Boone v. Boozman*, 217 F. Supp. 2d 938, 955 (E.D. Ark. 2002) (plaintiff cannot proceed under a hybrid rights theory by combining her free exercise right with a constitutional right that is not implicated under the facts of the case). Accordingly, the Court declines to conduct a strict scrutiny review under a hybrid rights theory. Plaintiffs' motion for summary judgment as to Counts I and II on a hybrid rights basis is denied.

### F. Missouri Constitution and the Missouri Religious Freedom Restoration Act (Counts IV and V)

Plaintiffs' fourth claim and fifth claims arise under Missouri law: Count IV is for a violation of the rights of conscience protected under Article I, Section 5 of the Missouri Constitution, and Count V is for a violation of Missouri's Religious Freedom Restoration Act, Mo. Rev. Stat. § 1.302. The City moved for summary judgment on both claims. Plaintiffs moved for summary judgment on the RFRA claim, but not the rights of conscience claim.

Under 28 U.S.C. § 1367(c)(3), district courts may decline jurisdiction over state claims as a "matter of discretion." *Hassett v. Lemay Bank and Trust Co.,* 851 F.2d 1127, 1130 (8th Cir. 1988). The Supreme Court has stated that if "the federal claims are dismissed before trial ... the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966). The Eighth Circuit has "stress[ed] the need to exercise judicial restraint and avoid state

law issues whenever possible" and the "necessity to provide great deference and comity to state court forums to decide issues involving state law questions." *Condor Corp. v. City of St. Paul,* 912 F.2d 215, 220 (8th Cir. 1990). Therefore, this Court declines jurisdiction over the state claims and will dismiss them without prejudice. Plaintiffs' motion for summary judgment as to Count V is denied. The City's motion for summary judgment as to Counts IV and V is denied.

Accordingly,

**IT IS HEREBY ORDERED** that The City of St. Louis's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part in accordance with the terms of this Memorandum and Order. (Doc. 32.)

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED.** (Doc. 36.)

**IT IS FURTHER ORDERED** that Counts I, II, and III of Plaintiffs' Complaint (Doc. 1) are **DISMISSED with prejudice.**

**IT IS FURTHER ORDERED** that pursuant to 28 U.S.C. § 1367(c)(3), Counts VI and V of Plaintiffs' Complaint are **DISMISSED without prejudice.**

An appropriate judgment and order of dismissal will accompany this memorandum and order.

_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of July, 2021.